IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT DOLLINGER, | ) | CASE NO.  1:20-CV-00044-JG |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES GWIN |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF THE SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Robert Dollinger ("Plaintiff" or "Dollinger") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and REVERSED AND REMANDED IN PART for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

On September 23, 2013, Dollinger filed an application for POD and DIB.  (Transcript ("Tr.") 205.) On September 25, 2014, Dollinger filed an application for SSI.  (*Id.*)  In both applications, Dollinger alleged a disability onset date of March 20, 2012, and claimed he was disabled due to: "staph spinal

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

meningitis" and memory issues from back injury; back injury with pain (03/12); staph spinal meningitis (back surgery 9/12); nerve, muscle, and brain damage from above infection; short and long-term memory problems; emotional and learning problems; ADHD; continued pain in back and infection area 24 hours a day; spinal and migraine headaches; unable to sit, walk, or drive without pain; unable to lift or move anything over a few pounds; and unable to sleep.  (*Id.* at 205, 347.)  The applications were denied initially and upon reconsideration, and Dollinger requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 205.)

On September 3, 2015, an ALJ held a hearing, during which Dollinger, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 3, 2016, the ALJ issued a written decision finding Dollinger was not disabled.  (*Id.* at 205-18.)  On January 12, 2017, the Appeals Council remanded the case back to the ALJ to: (1) "Obtain additional evidence concerning the claimant's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913)"; (2) "Further develop and evaluate whether the claimant engaged in substantial gainful activity since March 20, 2012 in accordance with 20 CFR 404.1571-1575 and 416.971-975 and the guidelines in Social Security Ruling 83-34"; and (3) "Provide the claimant the opportunity to review the post hearing evidence, including the opportunity to object to, comment on, or refute the evidence."  (*Id.* at 225-26.)

On August 22, 2017, the ALJ held a hearing, during which Dollinger, represented by counsel, and an impartial VE testified.  (*Id.* at 11.)  On December 6, 2018, the ALJ issued a written decision finding Dollinger was not disabled.  (*Id.* at 11-29.)  The ALJ's decision became final on December 5, 2019, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On January 9, 2020, Dollinger filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)  Dollinger asserts the following assignments of error:

(1)　　The ALJ erred in assigning little weight to the opinions of Mr. Dollinger's treating physician and treating psychologist;

(2)　　The ALJ erred in determining a residual functional capacity that accorded considerable and significant weight to the opinions of non-examining sources and excluded pertinent limitations imposed by Plaintiff's impairments.

(Doc. No. 12 at 22, 31.)

## II.　EVIDENCE

### A.　Personal and Vocational Evidence

Dollinger was born in October 1964 and was 52 years-old at the time of his second administrative hearing (Tr. 28), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has at least a high school education and is able to communicate in English.  (Tr. 28.)  He has past relevant work as a mortgage loan originator and a college instructor.  (*Id.* at 27.)

### B.　Medical Evidence[2]

On April 12, 2012, Dollinger saw his primary care provider Kathleen King, M.D., for continued left hip pain.  (*Id.* at 669.)  Dr. King noted this had been an ongoing problem, but this time it seemed more severe.  (*Id.*)  Dollinger reported he had been having lower back pain since early March after going on a bike ride, going up and down ladders, and then moving some heavy boxes.  (*Id.*)  The next day, he had pain in his lower back, buttock, and behind his left leg, and everything felt tight.  (*Id.*)  Dollinger told Dr. King he was having a hard time sitting down and the only position in which he was comfortable was lying down.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

Dollinger reported using ibuprofen three times a day and Naprosyn at bedtime.  (*Id.*)  An inversion table, lying down, and stretching helped his pain.  (*Id.*)  Standing for too long and sitting exacerbated the pain.  (*Id.*) Dollinger denied any leg weakness.  (*Id.*)  Dollinger also reported seeing a chiropractor since late March. (*Id.*)  On examination, Dr. King found:

> The patient does seem like he is in mild pain, but he is able to get up and down off the table, lie back, sit up and do the maneuvering without too much difficulty. There is minimal muscle spasm in the left lumbosacral region. He is tender slightly in the left SI joint, slightly in the left buttock and more so in the hip region just inferior to the greater trochanter. He does not really have bursal tenderness. He has full range of motion of his hip. It is actually fairly flexible with somewhat of a tight hamstring on the left side. Motor strength is 5/5. Deep tendon reflexes are normal. There is no vertebral tenderness.

(*Id.*)  Dr. King suspected Dollinger suffered from "a facet syndrome or possibly a herniated disk likely exacerbated by some sort of arthropathy since it has been a recurrent issue for him for a couple of years now."  (*Id.*)  Dr. King told Dollinger he could continue with chiropractic treatment and his homeopathic remedies of glucosamine and turmeric and prescribed a tapering course of prednisone.  (*Id.*)  She also stated if his condition was not "substantially better" by the end of the prednisone, he would need x-rays and an MRI.  (*Id.*)

On April 23, 2012, Dollinger saw Dr. King for follow up.  (*Id.* at 668.)  He reported an improvement in his pain, stating it had decreased from an 8 to 10 to a 2 to 4, but still had trouble sitting. (*Id.*)  Dollinger told Dr. King he did best walking around.  (*Id.*)  Dollinger reported the most pain was in his left buttock and radiated to his low back and occasionally the right buttock as well.  (*Id.*)  While Dollinger had been seeing a chiropractor, treatments were not helping that much.  (*Id.*)  On examination, Dr. King found "minimal spasm" in the LS-spine, tenderness in both SI joints, but the left more than the right, and "exquisite" tenderness on the left buttock with palpation.  (*Id.*)  Dr. King noted that the radiation had improved, but Dollinger's back and buttock pain had not.  (*Id.*)  Dr. King ordered an MRI and referred

4

Dollinger to pain management. (*Id.*) Dr. King also noted she wondered if Dollinger's stretching and yoga were "causing persistent tendonitis of the piriformis and obturator muscles." (*Id.*)

An April 27, 2012 MRI revealed a L5/S1 left paracentral disc protrusion abutting and "likely minimally posteriorly displac[ing]" the left S1 nerve root, and a small, broad-based posterior disc protrusion at L4/5. (*Id.* at 717-718.)

Dollinger continued chiropractic treatment through May 7, 2012. (*Id.* at 696-710.) By his last session, Dollinger rated his pain as a 0 to 3, that his back pain was "much better," and that he had gotten relief since his last visit. (*Id.* at 710.)

On May 18, 2012, Dollinger saw Dr. King for a refill of his Adderall prescription. (*Id.* at 667.) Dollinger reported continued back and leg pain and that he had run out of chiropractic visits. (*Id.*) Dollinger wanted to go to physical therapy. (*Id.*) Dr. King noted Dollinger had an appointment with pain management on June 13, 2012. (*Id.*) Dollinger reported using Flexeril, usually at night but occasionally half a pill during the day, although he did not like how it made him feel. (*Id.*) Dollinger also requested a referral to a new psychologist or psychiatrist. (*Id.*) Dr. King noted Dollinger was in mild distress secondary to back pain and preferred to stand. (*Id.*) Dr. King noted Dollinger was going to be doing physical therapy and was "currently interviewing a couple of places to proceed with them." (*Id.*) Dr. King referred Dollinger to psychiatry for his ADD, chronic anxiety, and mild obsessive disorder. (*Id.*)

On June 12, 2012, Dollinger saw J. Tim Sable, M.D., for pain management. (*Id.* at 410.) Dollinger complained of low back and left leg pain that started after Dollinger bent and twisted the wrong way. (*Id.*) Dollinger reported his pain interfered with his activities of daily living, including driving, walking, sports, hobbies, chores, sleeping, working, getting dressed, using stairs, going to the bathroom, concentrating, and having sex. (*Id.*) Dollinger told Dr. Sable sitting, exercising, having sex, bending forward or backward, lifting, coughing, sneezing, touching his skin, and working exacerbated

his pain.  (*Id.*)  Lying down, medication, ice, rest, and NSAIDs improved his pain.  (*Id.*)  Dollinger described his pain as shooting, burning, and sharp, and complained of associated symptoms of tingling, weakness, and insomnia.  (*Id.*)  Dollinger rated his pain as a three out of 10.  (*Id.*)  Dollinger told Dr. Sable sitting worsened his pain, which waxed and waned.  (*Id.*)

On examination, Dr. Sable found normal extremities, normal motor, sensation, and rotation, 5/5 strength in the bilateral upper and lower extremities, adequate range of motion and no tenderness in the cervical/thoracic spine, and adequate range of motion and no tenderness of the lumbosacral spine.  (*Id.*)  Positive examination findings included flexion pain, some buttock tenderness, and a positive straight leg raise on the left at 45 degrees sitting.  (*Id.*)  Dr. Sable diagnosed Dollinger with thoracic or lumbosacral neuritis or radiculitis, unspecified, and displacement of lumbar intervertebral disc without myelopathy. (*Id.* at 411.)  Dr. Sable started Dollinger on gabapentin and Percocet.  (*Id.*)  Dr. Sable noted if Dollinger was not getting substantial relief from physical therapy, he would refer Dollinger to a surgeon.  (*Id.*)

On June 27, 2012, Dollinger underwent an LS1 transforaminal epidural steroid injection on the left.  (*Id.* at 413.)  Dollinger rated his pain before the procedure as a 4-5 out of 10 and after the procedure a 0 out of 10.  (*Id.*)  On July 11, 2012, Dollinger underwent a lumbar interlaminar epidural steroid injection.  (*Id.* at 415.)  Dollinger rated his pain before the procedure as a 3-4 out of 10 and after the procedure as a 0 out of 10.  (*Id.*)

On July 25, 2012, Dollinger underwent an injection with fluoroscopy in the left sacroiliac joint. (*Id.* at 417.)  Treatment notes from that visit state Dollinger received great relief from the previous S1 injection but only minimal relief with the interlaminar injection.  (*Id.*)  Dollinger rated his pain before the procedure as a 3-4 out of 10 and after the procedure as a 1 out of 10.  (*Id.*)  Dr. Sable noted Dollinger came in with four pages of handwritten questions and he would need to schedule a follow up to address those points one by one.  (*Id.*)  Dollinger also reported he rear-ended someone six hours after taking

Percocet, and Dr. Sable noted the medicine should have been out of his system by then although Dollinger believed it was decreasing his reaction time.  (*Id.*)  Dr. Sable stopped Dollinger's medication and noted he would get Dollinger a surgical evaluation if Dollinger did not feel he was improving enough with injections, physical therapy, or medications.  (*Id.*)

On August 8, 2012, Dollinger saw Jeffrey S. Tharp, D.O., for a surgical consultation regarding his back pain.  (*Id.* at 786.)  Dollinger reported he had had left leg pain off and on for years but twisted while lifting something and the pain had been back since February.  (*Id.*)  Dollinger rated his pain as a 5 out of 10 and told Dr. Tharp the pain was worse with bending, bowel movements, coughing, sitting, and general activity.  (*Id.*)  Lying down improved his pain.  (*Id.*)  Dollinger denied any weakness in his lower legs.  (*Id.*)

On examination, Dr. Tharp found Dollinger came to stand independently and walked with a normal gait.  (*Id.* at 788.)  Dollinger exhibited good strength in heel to toe walking with good coordination.  (*Id.*)  Dr. Tharp found no pain to palpation in the shoulders, spine, or sciatic notch on the right.  (*Id.*)  Dr. Tharp found "exquisite tenderness" in the sciatic notch on the left.  (*Id.*)  Dollinger could forward flex at the waist to 90 degrees and extend to 30 degrees with "minimal pain."  (*Id.*)  While sitting, Dollinger could forward flex his neck 50 degrees, extend 50 degrees, and rotate 50 degrees without pain and crepitus.  (*Id.*)  Dr. Tharp found 5/5 strength in all myotomes in the upper and lower extremities bilaterally.  (*Id.*)  Pinprick sensation was intact in the upper and lower extremities but diminished in the L4 and S1 dermatomes on the left.  (*Id.*)  A straight leg raise was negative on the right and positive on the left.  (*Id.*)  Dr. Tharp found good strength, stability, and range of motion of the shoulders, elbows, wrists, hips, knees, and ankles without discomfort, instability, or pain.  (*Id.*)  Dr. Tharp ordered an EMG of the lower extremities and told Dollinger he would follow up with him afterward to determine whether he wanted to undergo a microlaminectomy/discectomy.  (*Id.*)

7

An August 9, 2012 EMG revealed "an L5-S1 level abnormality with ongoing denervation."  (*Id.* at 784.)

On August 29, 2012, Dollinger saw Dr. Sable for follow up.  (*Id.* at 419.)  Dollinger rated his pain as a 4-6 out of 10 and complained of numbness and tingling.  (*Id.*)  Dollinger reported he had gotten "[n]o clear prolonged benefit" from the injections and was undergoing a microdiscectomy performed by Dr. Tharp on September 7, 2012.  (*Id.*)

On September 7, 2012, Dollinger underwent a micro laminectomy/discectomy and was discharged in stable condition on September 8, 2012.  (*Id.* at 432.)  However, he developed a postural headache and underwent two blood patches.  (*Id.* at 460.)  On September 20, 2012, Dollinger was admitted to the hospital with complaints of nausea, light sensitivity, pain that was worse with standing, and drainage from his lumbar wound.  (*Id.* at 492.)  On September 21, 2012, Dollinger underwent an incision and drainage with excisional debridement, during which wound cultures were taken and a dural repair performed.  (*Id.*)  The wound cultures revealed spinal meningitis from staphylococcus infection.  (*Id.*)  After a seven-day hospital admission, Mr. Dollinger was transferred to a skilled nursing facility for six weeks of rehabilitation and strengthening.  (*Id.* at 493, 534-622.)  On discharge from the hospital, Dollinger's light sensitivity had resolved, his headache had improved, no leg pain, and he had no nausea or vomiting.  (*Id.* at 492.)

On November 6, 2012, Dollinger saw M. Fernanda Bonilla, M.D., for follow up.  (*Id.* at 774.)  Dollinger reported "severe headache[s]" when trying to concentrate.  (*Id.*)  The headaches would get better when he stopped what he was doing.  (*Id.*)  Dollinger told Dr. Bonilla he had no back pain, but he had short-term memory issues.  (*Id.*)  Dr. Bonilla noted Dollinger was sleeping very few hours at the skilled nursing facility where he was staying, and that Dollinger's father was concerned about his lack of sleep.  (*Id.*)  On examination, Dr. Bonilla found a full range of motion in all four extremities, normal range of

8

motion in all joints, normal gait, and 5/5 strength in the upper and lower extremities.  (*Id.*)  Dr. Bonilla noted no abnormalities with short-term memory.  (*Id.*)  Dr. Bonilla determined Dollinger's inflammation markers were normal and that Dollinger was "clinically doing very well."  (*Id.*)  Dr. Bonilla believed Dollinger's headaches were not secondary to his infection and were "very situational," and that a lack of sleep was playing a "significant role" in Dollinger's symptoms.  (*Id.* at 775.)

On December 18, 2012, Dollinger saw Dr. Bonilla for follow up.  (*Id.* at 624.)  Dollinger reported he had moved to his father's house and was sleeping better, although he still woke up after five to six hours of sleep.  (*Id.*)  Dollinger told Dr. Bonilla he did not feel he was back to normal cognitively because he could not concentrate like he used to or focus on job tasks well.  (*Id.*)  Dollinger reported his back was "'fixed'" and he was managing his back pain without opioids.  (*Id.*)  Dollinger complained of some nausea, cramping, and loose stools that improved after stopping his morphine, and mild headaches Dollinger believed were related to Keflex and resolved after a few minutes.  (*Id.*)

On examination, Dr. Bonilla found Dollinger's surgical incision was completely healed, he showed no signs of active infection, and his inflammation markers were normal.  (*Id.* at 625.)  Dr. Bonilla noted no cognitive deficits during her evaluation.  (*Id.*)  However, she did offer Dollinger a "neurological referral for evaluation of memory issues and also subjective cognitive deficits," but he declined.  (*Id.*)

On January 28, 2013, Dollinger saw Dr. King for congestion.  (*Id.* at 642-43.)  Dollinger complained of "intermittent headaches" and "difficulty sleeping" since his meningitis.  (*Id.* at 643.)  However, Dollinger was back to swimming and walking regularly, in addition to seeing a chiropractor regularly.  (*Id.*)  Dr. King suggested Dollinger get off his decongestants to help his insomnia.  (*Id.* at 647.)  She also noted Dollinger had some "mild memory deficits" and "persistence" in headaches after his meningitis but was "[o]verall improving."  (*Id.*)

On February 11, 2013, Dollinger saw Dr. Tharp for his three-month follow up visit.  (*Id.* at 753.)
Dollinger reported he was 80% improved, and he had been swimming 4-6 times a week and doing yoga
stretching.  (*Id.*)  Dollinger rated his pain as a 0-4 out of 10.  (*Id.*)  On examination, Dr. Tharp found
Dollinger walked with a slow gait pattern, had no pain to palpation in the shoulders, spine, or sciatic
notch, could forward flex at the waist 80 degrees and extend to 30 degrees with minimal pain, and while
sitting could forward flex his neck 50 degrees, extend 50 degrees, and rotate 50 degrees without pain or
crepitus.  (*Id.* at 754.)  Dollinger exhibited normal strength in the bilateral upper and lower extremities in
all myotomes, and pinprick sensation was intact.  (*Id.*)  A straight leg raise was negative.  (*Id.*)  Dr. Tharp
found Dollinger had patellar reflexes 1/4 symmetrically and absent ankle reflexes bilaterally.  (*Id.*)
Dollinger demonstrated good strength, stability, and range of motion of the shoulders, elbows, wrists,
hips, knees, and ankles without discomfort, instability, or pain.  (*Id.*)  Dr. Tharp told Dollinger his back
pain was coming from his degenerative disc and instructed him to continue his home exercise program.
(*Id.*)

On February 18, 2013, Dollinger saw Dr. King for follow up.  (*Id.* at 648.)  Dollinger reported his
back was "slowly getting better," although it was still tight at night.  (*Id.*)  Dollinger had resumed exercise
and swimming.  (*Id.*)  Dr. King changed Dollinger's medication for his insomnia.  (*Id.* at 653.)  Dr. King
noted Dollinger was "very sensitive" to his allergy symptoms, which were "not that severe."  (*Id.*)  Dr.
King further noted Dollinger had some "mild memory deficits" and some "persistence" in headaches after
his meningitis but was "[o]verall improving."  (*Id.*)

On March 4, 2013, Dollinger saw Dr. Sable for follow up.  (*Id.* at 751.)  Dollinger complained of
left-sided lower back pain that interfered with his personal life and getting back to work.  (*Id.*)  Non-
movement and reaching exacerbated his pain, while movement improved it.  (*Id.*)  Dollinger described his
pain as needle pain, stiffness, electrical shooting, dull, throbbing with tingling in his buttocks.  (*Id.*)

Dollinger told Dr. Sable he swam daily.  (*Id.*)    On examination, Dr. Sable found a well-healed lumbar incision with no signs of infection, negative straight leg raise tests, and normal sensation, rotation, and muscle strength.  (*Id.*)  Dr. Sable diagnosed Dollinger with myofascial pain and lumbosacral spondylosis. (*Id.*)  Dr. Sable prescribed medications, a TENS unit, and physical therapy for his low back.  (*Id.* at 751-752.)

On March 5, 2013, Dollinger saw Richard Kunig, DPM, for follow up of his orthotics.  (*Id.* at 749.)  Dollinger complained of dull, achy pain to the posterior plantar heel that had been worsening for two months, and icing, stretching, and heel lifts were not as effective as they had been in the past.  (*Id.*) Dr. Kunig noted Dollinger was a tri-athlete and noticed the pain after a 45-minute run.  (*Id.*)  Dollinger continued to complain of "slight arch pain" even with a remade left orthosis, usually the day after running. (*Id.*)  On examination, Dr. Kunig noted Dollinger had a normal gait.  (*Id.*)

Mr. Dollinger participated in a physical therapy program at NovaCare Rehabilitation from April 2013 through July 2013.  (*Id.* at 927-997.)  On May 1, 2013, Dollinger reported walking for 2.5 miles with minimal pain or discomfort.  (*Id.* at 944.)  On May 22, 2013, Dollinger reported that while he continued to have pain and stiffness in his lumbar spine, it had improved overall since beginning physical therapy.  (*Id.* at 971.)  On July 15, 2013, David Nemenz, PT, discharged Dollinger as "skilled rehabilitative services . . . are no longer required due to the patient's plateau in progress."  (*Id.* at 996.)  At discharge, Dollinger's prognosis was fair.  (*Id.*)

On May 13, 2013, Dollinger saw Dr. King for follow up.  (*Id.* at 654.)  Dollinger reported he hurt his back again after stretching it too far during physical therapy after taking Baclofen.  (*Id.*)  Dollinger told Dr. King he was "doing better" but was unsure "what to take to help advance physical therapy quicker." (*Id.*)  Dollinger complained of waking every one to two hours and was unsure how much of it was because of pain since he hurt at night.  (*Id.*)  Dr. King noted "concentration and focus issues," as well as that

11

Dollinger's back was "slowly healing in fits and starts."  (*Id.*)  On examination, Dr. King found Dollinger had decreased range of motion and abnormal findings of the lumbar spine.  (*Id.* at 657.)  Dr. King determined Dollinger was tight along the lumbar spine above the scar area, he was unable to move laterally without pain, and he was "reluctant to bend."  (*Id.*)

On June 4, 2013, upon Dr. Sable's referral, Dollinger saw Gary Sipps, Ph.D., for relaxation techniques.  (*Id.* at 1905.)  Dollinger reported his major problem was sleep impairment.  (*Id.* at 1906.)  Dollinger also complained of impairment in mobility, activities of daily living, and vitality, in addition to a fear of injury.  (*Id.*)  Dr. Sipps noted Dollinger's anxiety, depression, and hostility scores were within normal limits.  (*Id.*)  Dr. Sipps told Dollinger their work would be behavioral health regarding pain and related factors, not mental health.  (*Id.*)  Mr. Dollinger began regular visits with Dr. Sipps consisting of pain management psychotherapy, relaxation techniques, hypnosis, biofeedback, and stress management. (*Id.* at 1904.)

Mr. Dollinger again participated in a physical therapy program at NovaCare Rehabilitation from August 2013 through November 2013.  (*Id.* at 998-1015.)  On October 3, 2013, Dollinger reported he had "been feeling good lately" so he swam for an hour.  (*Id.* at 1007.)  He tried a flip turn at the end of his laps and pulled his back out again.  (*Id.*)  At his October 11, 2013 visit, Nemenz noted Dollinger "demonstrate[d] fearful behaviors related to ROM and stability exercises and declined ROM testing this date due to fear of 'pulling' back."  (*Id.* at 1012.)

On August 12, 2013, Dollinger saw Dr. King for his three-month follow up and prescription refills. (*Id.* at 660.)  Dollinger reported "[s]leeping a little better" as his back "slowly" improved.  (*Id.*)  Dollinger also told Dr. King seeing a chiropractor "helped a great deal" and his pain level was "down considerably." (*Id.*)  Dollinger rated his pain as a 5/10.  (*Id.*)  Dollinger reported he had tried to go back to work but his back hurt too much after a week.  (*Id.*)  Dollinger told Dr. King his back did not hurt as much when he

took his Adderall, which he believed was because he was "able to focus on things outside of himself rather than 'pinging around' with various physical discomforts."  (*Id.*)  Dollinger also complained of knees hurting a little more with hiking.  (*Id.* at 661.)  On examination, Dr. King found Dollinger had decreased range of motion and abnormal findings of the lumbar spine.  (*Id.* at 664.)  Dr. King determined Dollinger was tight along the lumbar spine above the scar area, Dollinger was unable to move laterally without pain, and Dollinger was "reluctant to bend."  (*Id.*)  Dollinger had an ice pack on and his skin was blue in the area.  (*Id.*)  Dr. King noted Dollinger's sleep was improving and "[d]iscussed with him that [she thought] this is the key to his full recovery."  (*Id.* at 666.)  Dr. King stated Dollinger's sequalae had improved, although he still had sleep and mild memory issues, he was off narcotics, was rarely using NSAIDs, was walking two miles a day, was swimming, and was "making steady progress."  (*Id.*)

On August 13, 2013, Dollinger saw Dr. Sipps for follow up.  (*Id.* at 1897.)  Dollinger discussed his frustration with what he perceived as slow progress in recovering from the onset of severe health conditions.  (*Id.*)

As of August 20, 2013, Dr. Sipps' treatment for Dollinger's ADHD consisted of affective-cognitive intervention, pain management psychotherapy, and stress management/coping skills.  (*Id.* at 1895.)

On November 8, 2013, Dollinger underwent a third lumbar trigger point injection with ultrasound.  (*Id.* at 795.)  Dollinger reported ">80 relief with last injection."  (*Id.*)  Dollinger rated his pain before the procedure as a 3-4/10, and after the procedure as a 2-4/10.  (*Id.*)

On November 21, 2013, Dollinger saw Joseph Konieczny, Ph.D., for a consultative psychological examination.  (*Id.* at 816.)  Dollinger reported his back and memory issues were the bases for his disability.  (*Id.*)  Dr. Konieczny noted Dollinger showed no difficulty in moving or walking, although he complained of a headache and low back pain.  (*Id.* at 817.)  While Dollinger reported occasional word

retrieval difficulties, Dr. Konieczny noted "no obvious indications of such" during the examination.  (*Id.* at 818.)  Dr. Konieczny opined Dollinger's ability to concentrate and attend to tasks showed no signs of impairment and he performed serial seven subtraction without error, although his recall for digits was within the extremely low range.  (*Id.*)  Dr. Konieczny also found no deficits in Dollinger's ability to perform logical abstract reasoning.  (*Id.*)  Dollinger showed no deficits in social judgment, conformity, or overall level or judgment, although Dr. Konieczny opined Dollinger's "overall level of functioning is at a reduced level of efficiency due primarily to what he perceives are his physical limitations, but also due to his memory deficits."  (*Id.*)

Dollinger described his typical day as waking up between 8:00 and 9:00 a.m., exercising, grooming, getting dressed, eating breakfast, exercising again, going on the computer, performing household errands and chores, eating lunch, more errands, chores, and computer time, resting his back, eating dinner, talking to friends on the phone, and watching television until bedtime between 10:00 p.m. and 12:00 a.m.  (*Id.*)  Dollinger attended church regularly and socialized outside his home regularly with friends and his girlfriend.  (*Id.*)  Dollinger rarely drove, but he cooked, cleaned, and did laundry and other household chores to the extent he felt he was physically able to do so.  (*Id.*)  He shopped on his own and managed his own finances.  (*Id.*)

Dr. Konieczny administered the Wechsler Adult Intelligence Scale-IV and the Wechsler Memory Scale IV.  (*Id.* at 818-19.)  Dollinger's IQ testing placed him in the average range of intellectual functioning, although his working memory was in the low-average to borderline range and he showed "significant deficits in the areas of attention and concentration, auditory memory, and retentiveness."  (*Id.* at 819.)  Results of the memory testing revealed very significant deficits in the areas of auditory memory and delayed memory.  (*Id.*)  Dollinger's visual memory, visual working memory and immediate memory ranged from the extremely low level to borderline level.  (*Id.* at 819-20.)  Dr. Konieczny stated it appeared

14

Dollinger "has suffered from fairly significant global memory deficits that are likely a residual effect of his reported coma episode in September of 2012." (*Id.* at 820.)

Dr. Konieczny opined Dollinger suffered from Cognitive Disorder, Not Otherwise Specified. (*Id.*) Dr. Konieczny further opined Dollinger would have moderate limitations in his ability to understand, remember, and carry out instructions, would have difficulty maintaining focus and persistence on moderate to complex multi-step tasks, and would have a diminished tolerance for frustration and diminished coping skills, which would impact his ability to respond to severe supervision, interpersonal situations, and severe pressure situations in the work setting. (*Id.*)

On December 5, 2013, Dollinger saw Dr. Sipps for follow up. (*Id.* at 1867.) Dollinger gave Dr. Sipps a Wall Street Journal article "on sequalae of ICU" and "expressed concern that the issues he is having [are] both physical and mental, resulting in part to ICU." (*Id.* at 1867-68.) Dr. Sipps noted Dollinger reported "having particular difficulty focusing and taking action." (*Id.* at 1868.)

On January 8, 2014, Dollinger saw Michael Harris, M.D. (*Id.* at 909.) Dollinger reported his memory was affected, he could not function at the level was before, and was "in a brain fog due to the meningitis." (*Id.* at 910.) Dollinger told Dr. Harris while was "definitely doing a little bit better," it had been a slow recovery. (*Id.*) Physically, Dollinger remained "very focused on his low back pain." (*Id.*) While his pain was usually a 2-3 out of 10, sometimes it increased to higher levels. (*Id.*) He could not do any of the triathlon activities he did before, although he did work out in addition to doing some therapy, swimming, and mild yoga. (*Id.*) However, Dollinger remained "very limited in terms of his range of motion" and his activity level and was "becoming increasingly frustrated with his lack of recovery." (*Id.*) Dr. Harris noted Dollinger had normal strength, but also "significant memory issues, brain fog," and he had to write everything down. (*Id.* at 911.)

On examination, Dr Harris found tight lumbosacral paraspinals with no spasm, "exquisitely tight"

15

hamstrings, and a straight leg raise on the left increased his back pain. (*Id.*) Dr. Harris found Dollinger "grossly intact" from a neurological perspective, as Dollinger recalled five digits forward and four backward, normal strength except for a 1/8" decrease in the left calf, good toe walk, and slight decrease in the left Achilles reflex. (*Id.* at 911-12.) Dr. Harris noted Dollinger's range of motion was "really limited" at about 30 degrees of flexion, but that Dollinger "was afraid to go beyond that point." (*Id.* at 912.) Dr. Harris' impression was that Mr. Dollinger had "chronic spondylogenic low back pain and left L5-S1 disk herniation, s/p laminectomy and discectomy 9/7/12, complicated by spinal leak and Staph meningitis," with "ongoing significant cognitive deficits and persistent back pain." (*Id.*) Dr. Harris recommended continued use of Baclofen, alternated with Robaxin, to balance his concerns about Dollinger's worsening back spasms versus improving his cognitive issues, and more aggressive physical therapy. (*Id.*)

On January 10, 2014, Dollinger saw Dr. King saw for refills and bloodwork. (*Id.* at 857.) Dollinger reported he was going through rehabilitation for his back and was referred to a specialist because "the muscle atrophy is not coming back despite the therapy." (*Id.* at 858.) Dollinger told Dr. King Baclofen helped his back spasms at night for the pain, and while Naprosyn helped a bit, it upset his stomach a little. (*Id.*) Dollinger told Dr. King his biggest issue since the meningitis was his short and medium-term (not long-term) memory problems. (*Id.*) Dollinger was trying to come off Baclofen in case that had something to do with his memory. (*Id.*) Dr. King noted Dollinger knew his sleep issues may be interfering with his memory as well. (*Id.*) Dollinger had no gait balance disturbance and his hip and left leg were much better, but his mid low back around the surgical site was quite painful, with muscle loss and decreased flexibility. (*Id.* at 859.) On examination, Dr. King found Dollinger's thoracic spine range of motion decreased, "tight bilateral latissimus dorsi," slightly tender lower ribs, and no vertebral tenderness. (*Id.* at 861-62.) Dr. King further found decreased range of motion and abnormal findings of

the lumbar spine, with tightness along the lumbar spine above the scar area.  (*Id.* at 862.)  Dollinger was unable to move laterally without pain and was reluctant to bend.  (*Id.*)  He had an ice pack on, and the skin was blue in the area.  (*Id.*)

On January 14, 2014, Dollinger saw Tim Walsh, P.T., for an initial physical therapy evaluation.  (*Id.* at 905.)  Dollinger reported daily left mid to low back and gluteal pain that ranged from a 2-5/10 with dressing, opening heavy doors, and carrying a gym bag.  (*Id.*)  Dollinger's goal was to sit comfortably.  (*Id.* at 906.)   On examination, Walsh found decreased range of motion, decreased strength, decreased flexibility, tender points, positive Shear, Fabers, and Scour tests, decreased functional skills, and complaints of pain.  (*Id.* at 906-07.)  Walsh determined further physical therapy was indicated to achieve long-term goals of dressing comfortably and easily, sitting uninterrupted for one hour easily, and decreasing Dollinger's pain to less than a 4/10 99% of the time.  (*Id.* at 907.)

On March 4, 2014, at his ninth visit, Walsh determined Dollinger showed "a slightly improved ROM tolerance and some core activation, LTG's achieved," and while Dollinger was "slow to progress," he had achieved several short-term goals, including decreasing his complaints of pain by 25%.  (*Id.* at 882.)  Walsh noted Dollinger had achieved long-term goals of increasing strength of core stabilizers and increasing range of motion in all planes by 10 degrees.  (*Id.*)

On March 11, 2014, after his last visit, Walsh determined that Dollinger's pain persisted at the same level of intensity and frequency, his flexibility restrictions remained, and his tissue tenderness persisted.  (*Id.* at 878-79.)  Walsh concluded that since Dollinger had completed his full course of physical therapy with such little progress, he did not believe further therapy was warranted.  (*Id.* at 879.)

On March 12, 2014, Dollinger saw Dr. Harris for follow up.  (*Id.* at 872.)  Dollinger rated his current pain as 3-5/10 and reported his pain had improved.  (*Id.*)  Dollinger's medication consisted of a half tab of 375 mg Naproxen, and Dollinger was not taking Baclofen, Robaxin, and ibuprofen.  (*Id.*)  Dr.

17

Harris noted Dollinger walked, swam, did a home exercise program and yoga, and meditated.  (*Id.* at 873.)  Dollinger reported he wanted to go back to work.  (*Id.*)  On examination, Dr. Harris found a "really limited" range of flexion to 40 degrees, tender left paraspinals and midline lumbar, tight left lumbosacral paraspinals with no spasm, tight hamstrings (Dollinger could not fully extend his knee), and a straight leg raise on the left increased his back pain.  (*Id.* at 874.)  Dr. Harris also found normal sensation, strength, bulk, and tone of all limbs bilaterally and normal reflexes.  (*Id.*)  Dr. Harris noted Dollinger "has ongoing significant cognitive deficits and persistent back pain.  However, his back pain is improving with conservative management, albeit the patient has a negative outlook on his improvements."  (*Id.*)  Dr. Harris told Dollinger to continue the Naproxen since Dollinger noted "good effect" from this medication, as well as continue yoga, ice, meditation, cognitive behavioral therapy, home exercise program, and aquatic therapy.  (*Id.* at 875.)  Dr. Harris discussed with Dollinger "realistic goals for chronic pain recovery and timing of recovery."  (*Id.*)

On April 24, 2014, Dollinger saw Dr. King for follow up.  (*Id.* at 1052.)  Dollinger complained of back and left leg pain that were "slowly improving."  (*Id.* at 1053.)  Dollinger reported he felt he was "very slowly progressing" and told Dr. King he had a "regimented program that [was] helping."  (*Id.*)  Dollinger told Dr. King he had been swimming, doing yoga, and doing daily stretches.  (*Id.*)  While he was making extremely slow progress, he was progressing.  (*Id.*)  Dollinger also complained of sequencing issues stemming from his ADHD, but felt he was "making strides in improvement."  (*Id.*)  Dr. King noted Dollinger's hip and left leg were much better, although the area around the surgical site was "quite painful with muscle loss and decreased flexibility."  (*Id.* at 1054.)  On examination, Dr. King found normal strength, gait, and station, with a slight tender deformity in the area of lumbar scarring.  (*Id.* at 1057.)  Dr. King noted Dollinger's staph infection was still affecting his sleep and cognition.  (*Id.* at 1058.)

On May 14, 2014, Dollinger caw Dr. Harris for follow up.  (*Id.* at 1020.)  Dr. Harris noted, "Since

last visit he had gotten better but very slightly. He is really concerned about the muscle stiffness in his right neck and left back.  He is very fixated on the muscle stiffness today." (*Id.* at 1020-21.)  Dollinger reported doing stretching every day, as well as yoga, and taking 2 tabs of Naprosyn a day.  (*Id.* at 1021.)  Dollinger also iced his back.  (*Id.*)  Dollinger told Dr. Harris he had not worked in over two years and his goal was to find a "sit down job."  (*Id.*)  On examination, Dr. Harris found "really limited" flexion of 40 to 50 degrees, no asymmetry, tender left paraspinals and midline lumbar spine, tight left lumbosacral paraspinals with no spasm, tight hamstrings (Dollinger could not fully extend his knee), and a straight leg raise on the left increased his back pain.  (*Id.* at 1022.)  Dr. Harris also found normal sensation, strength, bulk, and tone of all limbs, as well as normal reflexes.  (*Id.*)  Dr. Harris administered trigger point injections to Mr. Dollinger's right upper trapezius and left paraspinals.  (*Id.* at 1023.)

On August 6, 2014, Dollinger saw Dr. Harris for follow up.  (*Id.* at 1017-18.)  Dr. Harris noted, "Since last visit he had B hernia surgery & interstingly [sic], his bac [sic] pain has lessened."  (*Id.* at 1018.)  Dollinger rated his pain as a 3 out of 10.  (*Id.*)  Dollinger told Dr. Harris he still iced his back, and while he had not done his home exercise program since his hernia surgery, he was set to resume it in the next few weeks.  (*Id.*)  Dollinger reported the trigger point injection from the last visit helped.  (*Id.*)  Dollinger complained of right shoulder pain that was worse with overhead motion but had gotten better "very slightly."  (*Id.*)  Dollinger told Dr. Harris his "neuropathic pain ha[d] improved quite a bit" and now he mostly only experienced stiffness.  (*Id.*)  On examination, Dr. Harris found "really limited" flexion of 40 to 50 degrees, no asymmetry, tender left paraspinals and midline lumbar spine, tight left lumbosacral paraspinals with no spasm, tight hamstrings (Dollinger could not fully extend his knee), and a straight leg raise on the left increased his back pain.  (*Id.*)  Dr. Harris also found normal sensation, strength, fine motor coordination, and gait.  (*Id.*)  Dr. Harris's right shoulder examination revealed tenderness "over the lateral aspect of the acromion in the region of the supraspinatus tendon," "mildly positive" supraspinatus and

Kennedy-Hawkins signs, negative speeds and Yergason's testing, and normal range of motion.  (*Id.* at 1019.)  Dr. Harris ordered a right shoulder x-ray due to his upper trapezial stiffness.  (*Id.*)  The x-ray taken that day was normal.  (*Id.* at 1026-27.)

That same day, Dollinger underwent a sleep study for complaints of loud snoring, tiredness, difficulty maintaining sleep, frequent awakenings, and morning headaches.  (*Id.* at 1034.)  The sleep study revealed severe obstructive sleep apnea.  (*Id.* at 1035.)  J. Golish, M.D., recommended repeat sleep testing with CPAP titration and CPAP therapy with monitoring compliance.  (*Id.*)

Mr. Dollinger continued his weekly appointments with Dr. Sipps throughout 2014 and 2015.  (*Id.* at 1671-1861.)  While sleep difficulties remained an issue and Dollinger worked to find effective medications and treatment options, Dr. Sipps consistently noted "gradual progress," "reasonable progress," or "good progress" by Dollinger.  (*Id.* at 1671, 1675, 1677, 1679, 1681, 1683, 1685, 1687, 1689, 1691, 1693, 1695, 1697, 1699, 1701, 1703, 1705, 1707, 1709, 1711, 1713, 1715, 1717, 1719, 1721, 1724, 1726, 1728, 1730, 1732, 1736, 1738, 1740, 1742, 1744, 1748, 1750, 1754, 1760, 1764, 1766, 1770, 1778, 1780, 1784, 1786, 1788, 1794, 1796, 1798, 1800, 1802, 1804, 1806, 1808, 1810, 1812, 1814, 1816, 1818, 1820, 1822, 1824, 1826, 1828, 1830, 1832, 1834).  On January 14, 2015, Dollinger described feeling like he was "'in a fog'" and was "frustrated with his circumstances and his inability to focus."  (*Id.* at 1762.)  Dollinger continued with efforts to improve his cognitive function and memory recall for an eventual return to work.  (*Id.* at 1780, 1792, 1798, 1808, 1812.)

On August 10, 2015, Dr. Sipps completed two medical source statements regarding Dollinger's mental limitations.  (*Id.* at 917-18, 924-25.)  In the first, Dr. Sipps opined that as of February 18, 2014, Dollinger could rarely (defined as not being able to be performed for an appreciable time): maintain attention and concentration for extended periods of 2 hour segments; maintain regular attendance and be punctual within customary tolerances; function independently without redirection; work in coordination

20

with or proximity to others without being distracted; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember, and carry out complex job instructions.  (*Id.*)  Dr. Sipps further opined that as of February 18, 2014, Dollinger could occasionally (defined as the ability for the activity exists for up to 1/3 of a work day): respond appropriately to changes in routine settings; deal with the public; interact with supervisors; work in coordination with or proximity to others without being distracted; understand, remember and carry out detailed, but not complex, job instructions; socialize; relate predictably in social situations; and manage funds/schedules.  (*Id.*)

When asked what diagnosis and symptoms supported the assessment, Dr. Sipps wrote, "please see attached."  (*Id.* at 918.)  Attached was a letter dated February 18, 2014, opining Dollinger was "limited" in his ability for gainful employment as a result of impairments in his ability to understand, remember, and follow instructions, maintain attention and concentration with appropriate persistence and pace in performing multistep tasks, and respond appropriately to work pressures.  (*Id.* at 919.)  Dr. Sipps estimated Dollinger could return to work on August 18, 2014.  (*Id.*)

In the second medical source statement, Dr. Sipps opined that as of August 10, 2015, Dollinger could occasionally (defined as the ability for the activity exists for up to 1/3 of a work day): maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and understand, remember, and carry out complex job instructions.  (*Id.* at 924-25.)  When asked what diagnosis and symptoms supported the assessment, Dr. Sipps wrote, "please see attached."  (*Id.* at 925.)  Presumably,

21

Dr. Sipps was referring to a series of letters spanning July 2014 to July 2015 that preceded his second medical source statement and opined that Dollinger was "limited" in his ability for gainful employment as a result of impairments in his ability to understand, remember, and follow instructions, maintain attention and concentration with appropriate persistence and pace in performing multistep tasks, and respond appropriately to work pressures. (*Id.* at 920-23.)  In each of these letters, Dr. Sipps estimated Dollinger's return to work date as November 17, 2014, April 27, 2015, July 16, 2015, and October 29, 2015. (*Id.*)

On August 28, 2015, Dollinger saw Dr. Harris for follow up. (*Id.* at 1175-76.)  Dr. Harris wrote as follows:

> He is very diligent about his exercise program he is doing all the right things. He takes Naprosyn and baclofen as well as Robaxin. Occasionally, his sleep is an issue and he sometimes uses either Ambien or Lunesta, but he is trying to come off those. He is doing an active therapeutic strengthening program on a daily basis. He sees his psychologist regularly and cognitive behavioral therapy.
>
> Overall, he is in a pretty good place, but he is still very limited with regard to his functional capabilities. He still has significant back pain . . .
>
> Presently pain scale ranges between 4-8/10. If he takes it very easy and lies down throughout the day he is fine, but when he tries to be more active and lives like a normal person, he has marked increase in his pain. He can stand for maybe 20-30 minutes intervals, max 2 hours a day, but he needs to lie down throughout the day and can function only for about 4 hours max a day.

(*Id.* at 1176.)  On examination, Dr. Harris found "some marked limitations in range," negative straight leg raise, although it did cause a "pulling sensation" in Dollinger's low back, 4+/5 muscle strength, and normal sensation and reflexes. (*Id.* at 1176-77.)  Dr. Harris noted he completed Dollinger's disability paperwork that day. (*Id.* at 1177.)

That same day, Dr. Harris completed a medical source statement regarding Dollinger's physical capacity. (*Id.* at 1097-98.)  Dr. Harris opined, due to laminectomy and staph meningitis, Dollinger could lift/carry ten pounds occasionally and five pounds frequently, stand/walk for a total of two hours in an

eight-hour workday for 20 minutes at a time, sit for a total of four hours in an eight-hour workday for 45 minutes at a time, and rarely climb, balance, stoop, crouch, kneel, and crawl.  (*Id.* at 1097.)  Dr. Harris further opined Dollinger could occasionally reach, push/pull, and perform fine/gross manipulation.  (*Id.* at 1098.)  Dr. Harris opined Dollinger must avoid heights and temperature extremes.  (*Id.*)  Dr. Harris indicated Dollinger had been prescribed a cane, brace, and TENS unit.  (*Id.*)  Dr. Harris opined Dollinger experienced severe pain which would interfere with concentration, take him off task, and cause absenteeism.  (*Id.*)  Dollinger would need to elevate his legs to 90 degrees at will and would require additional unscheduled breaks totaling two to three hours on an average day.  (*Id.*)

Also that same day, Dollinger began another round of physical therapy with Walsh for low back pain and bilateral groin pain.  (*Id.* at 1172-73.)  Dollinger complained of daily low back pain, ranging from a 3-8/10, with lifting items over five pounds and sitting longer than ten minutes.  (*Id.* at 1173.)  On examination, Walsh found decreased range of motion, no focal myotomal weakness, decreased trunk stabilizing muscles, bilateral hamstrings lacking 80 degrees, IT band bilateral unable to cross midline, negative slump and straight leg raise tests, moderate to severe tenderness in the paraspinals, and labored function with lifting and carrying items.  (*Id.* at 1174.)  Walsh recommended ten visits with long term goals that included lifting groceries and trash with pain less than 4/10 and to sitting for 30 minutes with pain less than 4/10.  (*Id.*)

On September 18, 2015, Dollinger saw Walsh for physical therapy of his right shoulder strain.  (*Id.* at 1166.)  Dollinger complained of daily pain that ranged from a 1-3/10 at rest to 7/10 when sleeping on it, reaching across his trunk to bathe or grab his seat belt, and reaching behind his back to tuck in his shirt.  (*Id.*)  On examination, Walsh found interscapular strength of 4+/5 "but er/invers scap/abd 5/5 right with pain," normal flexibility, positive impingement test on the right, normal joint mobility but provoking, mild tenderness to palpation at the right bicipital groove, and labored sleeping on the right shoulder.  (*Id.* at

23

1167.)  Long-term goals included increasing strength of the interscapular region to 5/5, increasing range of motion tolerance, increasing function, and decreasing complaints of pain.  (*Id.* at 1168.)

On November 6, 2015, Dr. Sipps completed a letter stating Dollinger "continues with good progress which is, however, limited to a degree by ongoing health circumstances such as sleep impairment for which he is seeking specialist treatment."  (*Id.* at 1137.)  Dr. Sipps opined Dollinger continued to be limited in his ability to maintain gainful employment "due to impairment in his ability to maintain necessary routines and regimen required in the workplace."  (*Id.*)  Dr. Sipps estimated Dollinger's return to work date as February 28, 2016.  (*Id.*)

On November 24, 2015, Dr. Sipps discussed with Dollinger "his improved focus, concentration, and related efforts."  (*Id.* at 1681.)  On December 1, 2015, Dr. Sipps noted Dollinger "continues to present with improved focus, capacity for planning and decision making, problem solving, as well as organizing" and "continues with good progress."  (*Id.* at 1679.)  On December 22, 2015, Dr. Sipps noted Dollinger "displays continued improvement in cognitive capacity and function" and "continues with good progress."  (*Id.* at 1673.)

A December 8, 2015 MRI revealed "severe degeneration of the labrum involving the entire labrum, Rotator interval abnormality as described above. Rotator cuff tendinosis."  (*Id.* at 1180.)

On December 9, 2015, Dollinger saw Dr. Harris for follow up.  (*Id.* at 1154.)  Dr. Harris noted Dollinger had "come a long way" and his "back ha[d] improved significantly."  (*Id.*)  Dollinger reported intermittent pain, with good days about 40% of the time, bad days about 30% of the time, and in between days 30% of the time.  (*Id.*)  Dollinger worked out every day and was very diligent with his back, and Dr. Harris stated Dollinger had improved and was moving in a good direction.  (*Id.*)  However, Dollinger was still "very limited with regard to his physical capabilities."  (*Id.*)  Dollinger also complained of manageable shoulder pain at rest that he rated as a 3/10, but activity increased his pain.  (*Id.* at 1155.)  He

24

also woke up every night with pain in his shoulder.  (*Id.*)

On examination, Dr. Harris found some crepitus in the right shoulder but a fairly good range of motion with some pain at the end of the range, positive Kennedy, Hawkins, and impingement signs, negative apprehension sign, and some weakness due to pain limited with resisted internal and external rotation.  (*Id.*)  Dr. Harris's examination of Dollinger's back revealed limited motion, especially with flexion, tenderness along the lumbosacral junction, negative straight leg raise, good sensation, and some decreased reflexes in the lower back.  (*Id.*)  Dr. Harris administered a right glenohumeral joint injection, referred Dollinger for an orthopedic consultation, and extended his physical therapy.  (*Id.* at 1155-56.)

On January 5, 2016, Dollinger saw Blaine Bafus, M.D., for evaluation of his right shoulder pain.  (*Id.* at 1141.)  Dr. Bafus noted Dollinger had "rehabbed" from his back injury "very well."  (*Id.* at 1142.)  Dollinger complained of pain while doing an overhead swim stroke, throwing a baseball more than five times, and reaching behind his back.  (*Id.*)  Dollinger rated his pain from a 3-8/10.  (*Id.*)  He had tried injections and therapy.  (*Id.*)  Ice, therapy, medications, and seeing a chiropractor helped him.  (*Id.*)  On examination, Dr. Bafus found pain with internal rotation in the right, 5/5 strength, positive empty can and O'Brien testing, negative Yergason's, intact sensation to light touch, and palpable radial pulse.  (*Id.*)  Dr. Bafus determined the examination findings were "consistent with long head of the biceps pathology" and discussed with Dollinger the possibility of an arthroscopic debridement and biceps tenodesis.  (*Id.* at 1143.)

On February 12, 2016, Dollinger underwent right shoulder arthroscopy with extensive glenhumeral debridement, subacromial decompression, and open biceps tenodesis.  (*Id.* at 1197-1199.)

On March 9, 2016, Dollinger began physical therapy with Walsh for his right shoulder pain and weakness.  (*Id.* at 1286.)  Dollinger rated his pain from a 3/10 to a 6/10 when provoked.  (*Id.*)  As of May 20, 2016, Walsh determined Dollinger's range of motion, flexibility, and strength were "progressing

nicely" and Dollinger had achieved all his long-term goals, although his scapular pain, which ranged from mild to severe, persisted.  (*Id.* at 1258-59.)  Toward the end pf his physical therapy, Walsh determined Dollinger had made "significant" strength gains in the last month, with minimal deficits, mild deficits in range of motion and flexibility, constant scapular pain that persisted, and intermittent periods of no pain at the deltoid region.  (*Id.* at 1234-35.)  Dollinger had still not met his goals of increasing his function to allow ADL activities such as dressing/grooming and carrying dishes with minimal pain and decreasing his complaints of pain to less than a 4/10 90% of the time.  (*Id.* at 1235.)

On August 10, 2016, Dollinger saw Dr. Harris for follow up.  (*Id.* at 1229.)  Dollinger complained of pain between his shoulder blades and a had a mildly limited range of motion in his right shoulder.  (*Id.*)  Dollinger reported he "'threw his back out'" four days before and had been a little limited by his low back pain in performing his shoulder exercises.  (*Id.*)  Dollinger rated his right low back pain as a 7/10 and told Dr. Harris he had taken morphine once over the weekend and was now alternating ibuprofen and Tylenol.  (*Id.*)  On examination, Dr. Harris found back flexion to 65 degrees and extension to 15 degrees, no evidence of tenderness, bilateral fullness of the thoracolumbar paraspinal muscles without spasm, no evidence of trigger points, and negative straight leg raise bilaterally.  (*Id.* at 1231.)  Dr. Harris's examination of Dollinger's right shoulder revealed no tenderness to palpation of the mid to upper trapezius, bicipital groove, or over the AC joint, but tenderness to palpation of the bilateral paraspinals and rhomboids.  (*Id.*)  Dr. Harris also found trigger points bilaterally at the mid-rhomboids. (*Id.*)  Dollinger demonstrated full strength, flexion, and abduction of the shoulder.  (*Id.*)  Dr. Harris determined that Dollinger's right shoulder pain and function had improved since his surgery, but he was not yet at baseline.  (*Id.*)  Dr. Harris also concluded that Dollinger was experiencing an exacerbation of his back condition.  (*Id.*)

On August 18, 2016, Dr. Sipps completed a letter stating Dollinger "continues with good progress

which is, however, limited to a degree by ongoing health circumstances such as sleep impairment for which he continues to seek specialist treatment." (*Id.* at 1218.)  Dr. Sipps opined Dollinger continued to be limited in his ability to maintain gainful employment "due to impairment in his ability to maintain necessary routines and regimen required in the workplace." (*Id.*)  Dr. Sipps estimated Dollinger's return to work date as November 18, 2016. (*Id.*)

On August 31, 2016, Dollinger saw Dr. Bafus for follow up. (*Id.* at 1227.)  Dollinger reported he was "feeling much better," had regained his motion, and was "doing pretty much activities of choice," but still had a little weakness and tightness with internal rotation of his shoulder. (*Id.*)  On examination, Dr. Bafus noted Dollinger was sitting comfortably, had some deltoid atrophy on the right side, and 5/5 strength with internal and external rotation, but lacking some internal rotation. (*Id.*)  Dr. Bafus noted Dollinger was "actually doing quite well" and Dr. Bafus thought Dollinger was "doing better than he does." (*Id.* at 1228.)  Dollinger was "very comfortable" when Dr. Bafus applied full resistance and Dollinger abducted in scaption position. (*Id.*)

On November 9, 2016, Dollinger saw Dr. Harris for follow up. (*Id.* at 1223.)  Dollinger reported he was doing "much better." (*Id.*)  Dr. Harris noted Dollinger lacked approximately five degrees range of motion in abduction and flexion, with a 10 degree decrease in internal rotation. (*Id.*)  Dollinger reported much less pain in his shoulder and that his back flare up had been resolved. (*Id.*)  Dollinger rated his back pain at a 5/10 and his shoulder was pain free at rest, although it was worse with any lifting. (*Id.*)  Dr. Harris opined Dollinger remained "quite limited from a functional standpoint" and noted Dollinger was still waiting on a disability decision. (*Id.*)  Dr. Harris's examination findings regarding Dollinger's back remained unchanged. (*Id.* at 1225.)  Dr. Harris's examination of Dollinger's shoulder revealed no tenderness to palpation of the mid to upper trapezius, bicipital groove, or over the AC joint, but tenderness to palpation of the bilateral paraspinals and rhomboids. (*Id.*)  Dr. Harris found trigger points bilaterally at

27

the mid-rhomboids and "[a]bnormal scapulothoracic rhythm" on the left.  (*Id.*)  Dr. Harris determined that Dollinger's right shoulder pain and function had improved since his surgery, but he was not yet at baseline.  (*Id.*)  Dr. Harris recommended Dollinger continue with medications, physical therapy for his shoulder, and a home exercise program for his right shoulder and low back.  (*Id.* at 1226.)  Dr. Harris opined Dollinger was "unable to sustain gainful employment."  (*Id.*)

On November 14, 2016, Dollinger saw Samuel Friedlander, M.D., to establish care for sleep apnea.  (*Id.* at 1377.)  Dollinger reported difficulty with his sleep mask and waking up sweating or gasping, which happened with or without Ambien.  (*Id.*)   Dr. Friedlander noted Dollinger's pain management was better controlled.  (*Id.* at 1378.)

On December 2, 2016, Dollinger reported he was still waking up at night when using his CPAP machine.  (*Id.* at 1382.)  Dollinger was getting between 6.5 and 7 hours of total sleep.  (*Id.*)  Dr. Friedlander adjusted the settings on Mr. Dollinger's device.  (*Id.* at 1385.)

On December 23, 2016, Dollinger saw Dr. Friedlander for follow up.  (*Id.* at 1387.)  Dollinger reported his VPAP was not working.  (*Id.*)  Dr. Friedlander noted Dollinger had gone back to work.  (*Id.*)  Dr. Friedlander determined Dollinger was doing better with the adjusted settings but understood Dollinger reported difficulty with restful sleep.  (*Id.*)

On March 1, 2017, Dr. Sipps completed a third medical source statement regarding Dollinger's mental limitations.  (*Id.* at 1219-20.)  Dr. Sipps opined Dollinger had "moderate" limitations in his abilities to sequence multi-step activities, initiate and perform a task that he understands and knows how to do, work at an appropriate and consistent pace, ignore or avoid distractions while working, respond to demands, and adapt to changes.  (*Id.*)   Dr. Sipps further opined Dollinger would have "marked" limitations in his ability to complete tasks in a timely manner, sustain an ordinary routine and regular attendance at work, and work a full day without needing more than the allotted number or length of rest

28

periods during the day.  (*Id.* at 1220.)  When asked to state the diagnosis and medical and clinical findings supporting the assessment, Dr. Sipps wrote, "please see accompanying results."  (*Id.*)  Attached was a single record from August 20, 2013 that stated in its entirety under "General Examination:"

> [R]eviewed report of KSU neuropsychological evaluation of 2010 indicating the presence of 314.01; discussed his dealing with his circumstances over the years; continued to address frustration; interventions addressing aspects of components of treatment plan; continued to review pain managmenet [sic] strategies; affective-cognitive connections reviewed and strategies discussed; conducted induction to which he responded very well-focus writing activity; perceptions/experiences reviewed, he continue [sic] with writing, meditation.

(*Id.* at 1221.)

That same day, Dr. Sipps completed a letter stating Dollinger "continues to progress which is, however, limited to a degree by ongoing health circumstances, especially persistent sleep impairment for which he continues to seek specialist treatment for optimization in use of his current CPAP machine."  (*Id.* at 1339.)  Dr. Sipps opined Dollinger continued to be limited in his ability to maintain gainful employment "due to impairment in his ability to maintain necessary routines and regimen required in the workplace." (*Id.*)  Dr. Sipps estimated Dollinger's return to work date as September 1, 2017.  (*Id.*)

On March 3, 2017, Dollinger saw Dominic Lefoer, M.D., for follow up regarding his lab work and ongoing medical problems.  (*Id.* at 1297.)  Dollinger reported he had slipped on some snow about a month ago and continued to have knee pain along the medial aspect of his knee.  (*Id.*)  Dr. Lefoer noted Dollinger was employed as a college instructor and mortgage banker.  (*Id.* at 1298.)  On examination, Dr. Lefoer found tenderness to palpation and pain with range of motion of the medial left knee.  (*Id.* at 1302.)  Dr. Lefoer ordered an x-ray and referred Dollinger to orthopedics.  (*Id.* at 1305.)

On March 28, 2017, Dollinger saw Dr. Harris for follow-up.  (*Id.* at 1362.)  Dr. Harris noted Dollinger was "struggling on a lot of levels."  (*Id.*)  Dollinger complained of ongoing low back pain and severe left knee pain.  (*Id.*)  Imaging of his knee showed a prior medial meniscal cyst and a small

horizontal meniscal tear. (*Id.*) His knee pain interfered with his exercise program for his back. (*Id.*) While his right shoulder was improved, he still had ongoing pain with any lifting motion. (*Id.*) Dollinger also reported continuing to struggle with his sleep apnea. (*Id.*) On examination, Dr. Harris found left knee tenderness on the medial meniscus, "mildly positive Kennedy-Hawkins maneuver," "mildly positive McMurray's" test, good range of motion of the right shoulder, although still weak compared to the left, and mild tenderness of the biceps tendon on the right. (*Id.* at 1364.) Dr. Harris also found limited motion in the back, but a straight leg raise was negative. (*Id.*) Dr. Harris completed Dollinger's disability form and opined that "[b]ased on the multiple issues [Dollinger] is having and the constant fatigue with sleep apnea, he is unable to perform [s]ustained gainful employment." (*Id.* at 1365.)

That same day, in a second medical source statement regarding Dollinger's physical limitations, Dr. Harris opined that, based on shoulder surgery, lumbar disc surgery, staph infection, and left knee meniscal tear, Dollinger could occasionally lift/carry five to ten pounds and frequently lift five pounds, stand/walk for a total of three hours in an eight-hour workday for 30 minutes at a time, sit for a total of three to four hours in an eight-hour workday for 30 minutes at a time, rarely climb stairs, stoop, and crouch, and occasionally balance, kneel, and crawl. (*Id.* at 1291.) Dr. Harris further opined Dollinger could frequently reach, push/pull, and perform fine/gross manipulation. (*Id.* at 1292.) Dr. Harris opined Dollinger must avoid heights, moving machinery, and temperature extremes. (*Id.*) Dr. Harris indicated Dollinger had been prescribed a brace and a CPAP unit. (*Id.*) Dr. Harris opined Dollinger experienced severe pain which would interfere with concentration, take him off task, and cause absenteeism. (*Id.*) Dollinger did not need to elevate his legs to 90 degrees at will and would not require additional unscheduled breaks totaling two to three hours on an average day. (*Id.*)

On April 7, 2017, Dollinger saw Dr. Friedlander for follow up. (*Id.* at 1392.) Dr. Friedlander noted Dollinger's allergy injections were every five weeks as a result of work travel. (*Id.*) Dollinger was

using both a CPAP and BiPAP machine.  (*Id.*)  Dollinger reported waking and gasping on occasion, and according to his Fitbit he was waking four times a night.  (*Id.*)

On April 11, 2017, Dollinger underwent left knee arthroscopy with medial meniscus debridement after failing conservative management and electing to proceed with surgery.  (*Id.* at 1356.)

On April 12, 2017, Dollinger began physical therapy for his knee.  (*Id.* at 1437-39.)  Dollinger's goal was to be able to return to daily activities that would allow him to complete exercises for rehabilitation of his back and shoulder.  (*Id.* at 1436.)  On April 27, 2017, Dollinger reported walking a mile and a half before his knee got stiff.  (*Id.* at 1452.)

On June 8, 2017, Julie Blzjack, PT, determined Dollinger exhibited "an independent gait pattern" with all biomechanical gait characteristics appearing normal in all planes of motion for all phases, with no evident abnormalities.  (*Id.* at 1471-73.)  On June 23, 2017, Dollinger told Blzjack he was feeling better but was "only 60 percent better."  (*Id.* at 1478.)

On May 16, 2017, Dollinger saw Dr. Friedlander for follow up.  (*Id.* at 1398.)  Dr. Friedlander noted Dollinger had completed overnight pulse oximetry, which was normal.  (*Id.*)  Dollinger reported waking up several times a night according to his sleep watch app while using sleep aids.  (*Id.*)  Dr. Friedlander determined Dollinger was "doing better" with increased pressure on his machine.  (*Id.*)  Dr. Friedlander noted Dollinger's sleep apnea symptoms were improved with ASV and CPAP.  (*Id.* at 1403.)

On July 7, 2017, Dollinger told Blzjack his knee had been feeling good overall.  (*Id.* at 1483.)  Blzjack noted Dollinger tolerated the physical therapy session with minimal complaints of pain, but with some increase in fatigue due to his recent vacation and break from therapy.  (*Id.*)  Dollinger reported feeling good at the end of the session.  (*Id.*)

At the time of discharge on July 20, 2017, Dollinger had increased his lower extremity range of motion to -5 to 5/5 and was independent in basic care, although with difficulty.  (*Id.* at 1488.)  Dollinger's

questionnaire improvements score was 5/10 for walking, yoga, and biking.  (*Id.* at 1490.)

Dollinger continued to see Dr. Sipps throughout 2016 and 2017.  (*Id.* at 1509-1670.)  Dr. Sipps consistently noted Dollinger continued to make progress or good progress.  (*Id.*)  Dollinger expressed ongoing difficulty with sleep, which the psychologist viewed as a reasonable concern for a return to work as it had an adverse impact on his functioning, and encouraged Dollinger to consider seeing a psychiatrist to help with his persisting sleep problem. (*Id.* at 1511, 1516, 1605, 1623, 1631, 1633, 1649, 1657, 1661.) However, on May 31, 2017, Dollinger reported he "did fairly well sleeping in a tent at the beach without CPAP."  (*Id.* at 1553.)  On November 7, 2017, Dr. Sipps noted Dollinger was "currently exploring the possibility of temporary employment."  (*Id.* at 1518.)

On January 9, 2018, Dr. Sipps continued to encourage Dollinger to consider seeing a psychiatrist for consultation and treatment of continued difficulty with sleep.  (*Id.* at 1504.)

**C.      State Agency Reports**

**1.        Mental Impairments**

On December 17, 2013, state agency psychologist Jennifer Swain, Psy.D., opined Dollinger was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting.  (*Id.* at 182-84.)  Dr. Swain further opined Dollinger was capable of simple to moderately complex routine tasks in a static environment, tasks that do not involve strict time or production standards, occasional contact with coworkers and supervisors, and infrequent change.  (*Id.*)

On April 7, 2014, on reconsideration, Kristen Haskins, Psy.D., affirmed Dr. Swain's assessment but determined Dollinger also would be moderately limited in his ability to sustain an ordinary routine without special supervision.  (*Id.* at 197-99.)  Dr. Haskins further opined Dollinger was capable of simple to moderately complex routine tasks in a static environment and "in a setting tha[t] does not need close sustained focus/concentration or sustained fast pace," tasks that do not involve strict time or production standards, occasional contact with coworkers and supervisors, and infrequent change.  (*Id.* at 197-98.)

### 2.      Physical Impairments

On December 17, 2013, state agency physician Diane Manos, M.D, opined Dollinger could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand/walk and sit for about six hours in an eight-hour workday, frequently climb ramps/stairs, stoop, kneel, and crouch, and occasionally climb ladders/ropes/scaffolds and crawl.  (*Id.* at 180-82.)

On April 4, 2014, on reconsideration, Esberdado Villanueva, M.D., affirmed Dr. Manos's assessment.  (*Id.* at 195-96.)

### D.      Hearing Testimony

During the August 22, 2017 hearing, Dollinger testified to the following:

- He drives, but somedays he cannot because of pain in his back and sometimes pain in his shoulder or knee.  (*Id.* at 47.)

- He filed for disability for memory issues, pain, and not being able to move.  (*Id.* at 49.)

- His back surgery resolved his drop foot and reduced his pain level a bit.  (*Id.* at 48-49.)  However, he cannot sleep more than three or four hours a night; sometimes it's because of pain, but his doctors have said it's from the effects of his staph infection. (*Id.*)  He also has mobility problems that make it difficult for him to get dressed and put on socks and shoes.  (*Id.* at 50.)  He had short-term and medium-term memory issues.  (*Id.*)  He tries to write everything down.  (*Id.*)  His girlfriend says it takes him "forever" to get things done.  (*Id.* at 51.)  Sometimes he is in the middle of something and he cannot think.  (*Id.*)  He does not balance a checkbook but reads what he can. (*Id.*)  He can read short stories and keep up with current events.  (*Id.* at 51-52.) Sometimes he has a hard time just brushing his teeth or washing his face.  (*Id.* at 53.) When his back pain flares up, it is hard for him just to walk from his bedroom.  (*Id.*)

33

He has two flare ups a month.  (*Id.* at 54.)  Physical activities like reaching, bending, and repetitive tasks will flare up his back.  (*Id.* at 91.)

- He also has a right shoulder problem, and he is right-handed.  (*Id.* at 56.)  He underwent shoulder surgery, and since then the pain is less.  (*Id.* at 57-58.)  He also regained some movement that he did not have before surgery, but he has not regained his strength.  (*Id.* at 58.)  He has a hard time reaching for anything above shoulder height.  (*Id.*)

- He fell when walking with his girlfriend and ended up tearing his meniscus.  (*Id.* at 58-59.)  He could not even walk down the hall.  (*Id.* at 59.)  He underwent knee surgery and was in the process of rehabilitating his knee.  (*Id.*)

- He could stand sometimes for a half an hour, sometimes an hour, and sometimes a little more than that.  (*Id.* at 59-60.)  He tried to limit it to a half hour or less if he can because of the pain involved and the lessons he has learned if he pushes it longer in paying for it the next day.  (*Id.* at 60.)  His doctors want him to walk as much as he can.  (*Id.* at 61.)  When he is in a flare he can only walk for five minutes.  (*Id.*)  He can walk an average of 15 or 20 minutes.  (*Id.* at 62.)  Some days are better than others.  (*Id.*)  He tries to limit sitting to 15 minutes, no more than half an hour, especially if it's a seat with no orthopedics or anything.  (*Id.* at 63.)  He was wearing an ice pack and a back brace at the hearing.  (*Id.*)  He can carry a couple of pounds.  (*Id.*)  Sometimes he struggles just moving a light load of laundry.  (*Id.* at 63-64.)  Any kind of upward mobility and reaching and pulling is a problem for him because of his shoulder and back.  (*Id.* at 65.)

- His most comfortable position is lying down with ice on his lower back and pillows under his upper legs.  (*Id.*)  He will then sit for a while and walk if he can.  (*Id.*)  He also has different stretching exercises he does.  (*Id.*)

- He uses an ice pack daily.  (*Id.*)  He also has a back brace and TENS unit.  (*Id.* at 66.)  He uses the TENS unit almost every day.  (*Id.*)  He has not used a cane since his knee surgery.  (*Id.*)

- Some things have gotten better since his last hearing and some things have gotten worse.  (*Id.* at 68.)  His back pain and memory problems have stayed the same or gotten a little bit worse because of his sleep issue.  (*Id.* at 69.)  He also has central sleep apnea.  (*Id.*)  Even after taking an Ambien, he wakes up 40 to 45 minutes later and is awake for half an hour.  (*Id.* at 70.)  He has tried Ambien, Lunesta, and muscle relaxers, but after 30 to 45 minutes he wakes up for half an hour and then he falls back asleep and then wakes up in a sweat, even with his BiPAP machine.  (*Id.* at 70-71.)  He uses his BiPAP machine "religiously."  (*Id.* at 71.)

- His shoulder pain has gotten better since the surgery, and he can move his shoulder pretty freely to a certain degree.  (*Id.* at 75-76.)  His shoulder pain is a two to three out of ten with little to no activities.  (*Id.* at 75.)  He is not walking a half a mile a day, and when he was it was two years after surgery and three years ago, with a cane and

34

stopping and starting over the course of a day.  (*Id.* at 76.)  He would swim with swim fins and a backboard and go back and forth.  (*Id.* at 77.)  A lot of times he would go to the pool just to be in the pool, and then get out and do his exercises and stretches, and then go back in and go back and forth some more.  (*Id.*)

- He lives in a two-story home with his parents.  (*Id.* at 78.)  He only goes up the stairs at his parents' house if there is something he "absolutely" needs up there.  (*Id.* at 79.)  He tries to avoid the stairs if he can.  (*Id.*)  His girlfriend lives in an apartment building and he takes the elevator.  (*Id.*)

- Grabbing something with weight or lifting is difficult and painful because of his shoulder and he tries to avoid it all costs.  (*Id.* at 80-81.)  He could lift a quart of milk.  (*Id.* at 88-89.)

- His back pain is a four to five out of ten with icing and the TENS unit.  (*Id.* at 81.)  He takes his prescription pain medicine as needed.  (*Id.*)  His back was aggravating him during the hearing, and he was gritting his teeth as he was sitting.  (*Id.* at 87.)

- His range of motion in his knee is better, and the pain is also a little bit better, although it is different pain than before the surgery.  (*Id.* at 84.)  Now that the meniscus is out, it is bone on bone.  (*Id.*)  His pain is a four out of ten on a typical day.  (*Id.* at 89.)

- He has asthma.  (*Id.* at 82.)  He uses Singulair daily and albuterol as needed.  (*Id.* at 83.)

- He still gets spinal headaches every ten days that can be severe.  (*Id.* at 85.)  The prescription medication he has for them doesn't really work.  (*Id.* at 86.)

- Sending emails can be difficult, so he tries to write.  (*Id.* at 83.)  He tries to journal.  (*Id.*)

- He got along satisfactorily with everyone in his past relevant work.  (*Id.* at 97.)  He had a set pattern of how he likes to do things, but that is different than how he interacts with people.  (*Id.* at 98.)  He is a very direct person and sometimes does not have a filter.  (*Id.* at 99.)  Now he is more impatient, and it is harder for him now.  (*Id.*)  He had a filter before.  (*Id.*)

The ALJ told the VE Dollinger's past work as a mortgage loan originator and a college instructor had been determined at the last hearing and counsel had stipulated to it.  (*Id.* at 42-43.)  The ALJ then posed the following hypothetical question:

> So, Mr. Burkhammer, imagine a hypothetical individual with Mr. Dollinger's vocational profile who is limited to the performance of light work as defined under the regulations, except he should never climb ladders, ropes, or scaffolds.  He can occasionally climb ramps or stairs,

balance, stoop, kneel, crouch and crawl. He is limited to occasional overhead reaching with the right upper extremity; and he should avoid concentrated exposure to fumes, odors, dust, gases and other pulmonary irritants. This individual is further limited to routine tasks involving no fast-paced work, no strict production quotas, and no more than minimal or infrequent changes in the work setting.

* * *

So, I'm going to ask a couple of different questions there on that, Mr. Burkhammer, but finally I want to say that the individual is limited to frequent interaction with the public, coworkers and supervisors. That's the balance of those limitations. Given those limitations, would you agree that the hypothetical individual could not do Mr. Dollinger's past work?

(*Id.* at 96, 99.)

The VE testified the hypothetical individual would not be able to perform Dollinger's past work as a mortgage loan originator and college instructor. (*Id.* at 99.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office helper, housekeeping/cleaner, and sales attendant. (*Id.* at 100.)

In the second hypothetical, the ALJ reduced the interaction from frequent to occasional. (*Id.*) The VE eliminated the sales attendant position, but the other two would remain. (*Id.*) The VE substituted the sales attendant position with a mail clerk. (*Id.* at 100-01.)

In response to a question from Dollinger's counsel, if standing and walking were restricted to three hours total in an eight-hour day, all light jobs would be eliminated, and only sedentary jobs would remain. (*Id.* at 101-02.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

36

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f)*,* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment

37

does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Dollinger was insured on his alleged disability onset date, March 20, 2012, and remained insured through June 30, 2017, his date last insured ("DLI.")  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Dollinger must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since March 20, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: asthma; lumbar degenerative disc disease, status-post L5-S1 micro decompression and discectomy; status post right shoulder arthroscopic surgery; status post left knee medial meniscus tear and repair surgery; cognitive disorder, status-post surgical meningitis; and attention deficit hyperactivity disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should never climb ladders, ropes or scaffolds.  He can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl.  The claimant is limited to occasional overhead reaching with his right upper extremity.  He should avoid concentrated exposure to fumes, odors, dust, gases and other pulmonary irritants.  The claimant is further limited to routine tasks involving no fast-paced work, no strict production quotas, and no more than minimal or infrequent changes in the work setting.  He is limited to occasional interaction with the public, coworkers and supervisors.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October **, 1964 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 20, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-29.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings

are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012

40

WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.   First Assignment of Error: Evaluation of Treating Source Opinions

In his first assignment of error, Dollinger argues the ALJ erred in assigning little weight to the opinions of Dr. Harris, one of Dollinger's treating physicians, and Dr. Sipps, Dollinger's treating psychologist.  (Doc. No. 12 at 22.)   Dollinger asserts, "Here, the ALJ did not properly evaluate the opinions of Dr. Harris and Dr. Sipps because he failed to analyze the opinions under the required standards of controlling weight and then assigned the opinions little weight without any application of the requisite regulatory factors to allow meaningful review."  (*Id.* at 24.)

The Commissioner responds that the ALJ "appropriately discounted" the opinions of Dr. Harris and Dr. Sipps.  (Doc. No. 14 at 5, 9.)  The ALJ considered regulatory factors in discounting the opinions.  (*Id.* at 6, 11.)  Furthermore, check-box form opinions are "inherently unsupported."  (*Id.* at 7, 10) (citing cases).  Dollinger cannot support the opinions *post-hoc* by identifying records that could have supported the doctors' opinions, but which the doctors themselves did not cite.  (*Id.* at 8, 10-11.)  In addition, the ALJ was not "required to specifically decline giving controlling weight to the opinions before giving the opinions little weight."  (*Id.* at 9, 10.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the

process by which the Commissioner accords it weight." *Id.* "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[3]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306, at *1 (Soc. Sec. Admin. Mar. 27, 2017).

opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to medical opinions. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x

498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 F.

App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014).

### a.  Dr. Harris's Opinions

Here, the ALJ determined at Step Two that Dollinger had the severe impairments of asthma,

lumbar degenerative disc disease, status-post L5-S1 micro decompression and discectomy, status post

right shoulder arthroscopic surgery, status post left knee medial meniscus tear and repair surgery,

cognitive disorder, status-post surgical meningitis, and ADHD.  (Tr. 14.)  After finding Dollinger's

impairments did not meet or equal a listing, the ALJ proceeded to consider the medical evidence regarding

Dollinger's physical and mental impairments at Step Four.  (*Id.* at 17-27.)  Regarding Dollinger's back,

shoulder, and knee pain, the ALJ acknowledged medical records documenting tenderness, decreased range

of motion, and pain with motion.  (*Id.* at 18-22.)  However, the ALJ also noted normal examination

findings in the record, including full strength, negative straight leg raises, and a return to regular

swimming and walking, in addition to decreased pain and improvement in range of motion with treatment.

(*Id.*)  Further, the ALJ noted Dollinger's daily activities and that he did not take much in the way of pain

medication.  (*Id.* at 17-18, 23.)  The ALJ determined that while Dollinger appeared to believe "that he is

extremely limited, the evidence does not fully support this level of limitation."  (*Id.* at 23.)

The ALJ then considered the medical opinion evidence.  (*Id.* at 23-27.)  Regarding Dollinger's

physical impairments, the ALJ assigned "significant weight" to the opinions of state agency physicians,

Drs. Manos and Villanueva, although he "further restricted the claimant's postural limitations to better

reflect [Dollinger's] reports of pain and limitations, including his testimony at the hearing."  (*Id.* at 24.)

The ALJ analyzed Dr. Harris's opinions as follows:

> On August 28, 2015, Dr. Harris, the claimant's treating physician, opined
> that the claimant was limited to less than sedentary exertion (Exhibits
> 11F/11, 19F/2-3, and 23F/40). On March 28, 2017, Dr. Harris again found
> that the claimant was limited to less than sedentary exertion (Exhibit 28F).

Additionally, on August 28, 2015, and again on March 28, 2017, Dr. Harris opined that the claimant was incapable of sustaining gainful employment (Exhibit 11F/11, 19F/2-3, 23F/40, and 28F). While the undersigned notes that an opinion on whether an individual is able to work goes to an issue reserved to the Commissioner and therefore cannot be given special significance, such opinion should still be considered in the assessment of the claimant's residual functional capacity (20 CFR 404.1527(d) and 416.927(d)). These findings are granted limited weight. The evidence of record does not support such extreme limitation, particularly evidence showing that the claimant had resumed regular swimming and walking (Exhibit 6F/30-36). Further, upon examination, the claimant's back had no tenderness, no spasms, and no evidence of trigger points. Further, straight leg raise was negative. He was noted to sit comfortably; he had full five out of five strength, was noted to be doing quite well, and he was quite comfortable, even when his doctor applied full resistance (Exhibit 27F/5-6, 7- 10). Therefore, these findings are granted limited weight.

(*Id.* at 24-25.)

As Dr. Harris constituted a "treating physician" at the time of his opinions,[4] the ALJ was required to determine whether his opinion was entitled to "controlling weight" and, if not, articulate "good reasons" for discounting Dr. Harris's opinions regarding Dollinger's physical functional limitations.  As another decision from this District recently explained, evaluation of a "treating physician" opinion entails a two-step process:

The Sixth Circuit in *Gayheart v. Commissioner of Social Security* recently emphasized that the regulations require two distinct analyses, applying two separate standards, in assessing the opinions of treating sources.  This does not represent a new interpretation of the treating physician rule.  Rather it reinforces and underscores what that court had previously said in cases such as *Rogers v. Commissioner of Social Security, Blakley v. Commissioner of Social Security*, and *Hensley v. Astrue*.

As explained in *Gayheart*, the ALJ must first consider if the treating source's opinion should receive controlling weight.  The opinion must receive controlling weight if (1) well-supported by clinical and laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the administrative record. These factors are expressly set out in 20 C.F.R. §§ 404.1527(d)(2).  Only if the ALJ decides not to give the treating source's opinion controlling weight will the analysis proceed to

---

[4] The ALJ recognized Dr. Harris as a treating physician and the Commissioner does not challenge that determination.  (Tr. 24; Doc. No. 14.)

what weight the opinion should receive based on the factors set forth in 20 C.F.R. §§ 404.1527(d)(2)(i)–(ii), (3)–(6). The treating source's non-controlling status notwithstanding, "there remains a presumption, albeit a rebuttable one, that the treating physician is entitled to great deference."

The court in *Gayheart* cautioned against collapsing these two distinct analyses into one. The ALJ in *Gayheart* made no finding as to controlling weight and did not apply the standards for controlling weight set out in the regulation. Rather, the ALJ merely assigned the opinion of the treating physician little weight and explained that finding by the secondary criteria set out in §§ 1527(d)(i)–(ii), (3)–(6) of the regulations, specifically the frequency of the psychiatrist's treatment of the claimant and internal inconsistencies between the opinions and the treatment reports. The court concluded that the ALJ failed to provide "good reasons" for not giving the treating source's opinion controlling weight.

\* \* \*

In a nutshell, the *Wilson/Gayheart* line of cases interpreting the Commissioner's regulations recognizes a rebuttable presumption that a treating source's opinion should receive controlling weight. The ALJ must assign specific weight to the opinion of each treating source and, if the weight assigned is not controlling, then give good reasons for not giving those opinions controlling weight.

*Sito v. Comm'r of Soc. Sec.*, 229 F. Supp. 3d 633, 640-641 (N.D. Ohio 2017) (footnotes omitted). *See also Roche v. Comm'r of Soc. Sec.*, No. 1:17CV177, 2017 WL 6512236, at **21-22 (N.D. Ohio Dec. 12, 2017), *report and recommendation adopted by* 2017 WL 6502614 (N.D. Ohio Dec. 19, 2017); *Marks v. Colvin*, 201 F. Supp. 3d 870, 875 (S.D. Ohio 2016).

Dollinger first asserts the ALJ erred in failing to determine, under the first step of the evaluation process set forth in *Gayheart, supra*, whether "controlling weight" should be accorded to Dr. Harris's opinions. (Doc. No. 12 at 22-24, 27.) The Court agrees. The ALJ's discussion of Dr. Harris's opinions fails to either mention the "controlling weight" concept or properly assess the regulatory factors set forth in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) *i.e.*, whether the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence in the case record."

46

As the Commissioner points out, Dr. Harris's two medical source statements are "check-box forms" with no other explanation for his findings beyond listing Dollinger's diagnoses. (Tr. 1097-98, 1291-92.) As this district as previously recognized, "Numerous decisions have found that the use of checklist or check-the-box forms that contain little to no accompanying explanation for the assessed limitations, such as the one used herein by Dr. Ike and Ms. Murphy, are unsupported and, therefore, the ALJ may properly reject treating source opinions contained in such forms." *Gallagher v. Berryhill*, No. 5:16-cv-01831, 2017 WL 2791106, at *8 (N.D. Ohio June 12, 2017), *report and recommendation adopted by* 2017 WL 2779192 (June 27, 2017). That is true regardless of whether the ALJ's analysis of the treating source opinion identifies the check-box format as a reason for discounting it. *Id.* at *9 (citing *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563 (6th Cir. 2016)). Another Sixth Circuit decision concluded that a check-box form without any explanation is "weak evidence at best" and meets the "patently deficient" exception for harmless error in non-compliance with the treating source rule. *Id.* (quoting *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 475 (6th Cir. 2016)). Given this weight of authority, Dr. Harris's medical source statements, which are check-box forms absent any explanation for his findings except for Dollinger's diagnoses, are "patently deficient" and the ALJ's error in failing to comply with the two-step analysis required for the treating source rule is harmless.

But the ALJ also weighed and considered another opinion from Dr. Harris, contained in treatment notes dated August 28, 2015. (Tr. 24.) Dr. Harris opined:

> From a functional standpoint, he remains very limited. As outlined above, he needs to lie down frequently throughout the day in order to get through the day. He cannot sit or stand for more than about 30-40 minutes and is incapable of sustaining gainful employment based on the physical issues with his back as well as the cognitive issues from the meningitis. His disability papers were completed today.

(*Id.* at 1177.)

Dr. Harris's treatment notes acknowledge that while Dollinger was "in a pretty good place," he was "still very limited with regard to his functional capabilities" and was still experiencing "significant back pain." (*Id.* at 1176.) Dr. Harris's physical examination revealed mixed findings, including tenderness along the midline, "marked limitations in range," a negative straight leg raise, although it did cause a pulling sensation in Dollinger's lower back, 4+/5 strength, and normal sensation and reflexes. (*Id.* at 1176-77.) While the ALJ included these findings in his recitation of the relevant medical evidence (*id.* at 21), the ALJ did not *explain* how those findings detracted from Dr. Harris's opinion included in those same treatment notes.[5] (*Id.* at 24-25.) This is significant especially considering that while Dr. Harris noted Dollinger's improvement, he continued to find Dollinger to be "very limited" in terms of his physical abilities. (*Id.* at 1154-55, 1176-77.)

The ALJ's failure to properly conduct a controlling weight analysis (and, further, to address the foregoing objective and/or clinical evidence in discounting Dr. Harris's opinion) deprives the Court of the opportunity to meaningfully review whether he undertook the "two-step inquiry" required when analyzing treating source opinions. *See Gayheart*, 710 F.3d at 376–78 (stating the lack of explanation regarding the "controlling weight [analysis] hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation"). Such failure amounts to reversible error. *See Marks*, 201 F. Supp. 3d at 882.

Moreover, assuming *arguendo* the ALJ had properly conducted a controlling weight analysis, the Court finds the ALJ failed to provide "good reasons" for rejecting Dr. Harris's August 28, 2015 opinion. As discussed above, if an ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific

---

[5] As courts within this district have held, an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected." *Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282, at *7 (N.D. Ohio July 31, 2013).

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242.  *See also Gayheart*, 710 F.3d at 376.

Here, the ALJ does not address the majority of the factors set forth in §§ 404.1527(c)(2) and 416.927(c)(2), including the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, the treating source's specialization (or lack thereof), and the extent to which the source is familiar with other information in the case record.  The ALJ offers one reason for assigning limited weight to Dr. Harris's opinion: inconsistency with other evidence in the record.  However, in support, the ALJ cites to one treatment record from 2013, dated over two years before Dr. Harris rendered his opinion, and a 2016 treatment record regarding Dollinger's shoulder.  (Tr. 25.)  The record regarding Dollinger's shoulder has limited bearing on his back pain.  Further, while the ALJ also cited a 2016 visit with Dr. Harris regarding both Dollinger's back and shoulder, the ALJ did not discuss the positive findings on examination, particularly decreased lumbar lordotic curvature, limited range of motion, and findings consistent with lumbar strain, or how those findings detracted from Dr. Harris's opinion that Dollinger remained functionally limited.[6]  (*Id.*)  Moreover, as noted earlier, Dr. Harris consistently stated Dollinger had improved over time, but that he remained functionally limited.

Accordingly, and for all the reasons set forth above, it is recommended the Court find the ALJ failed to properly evaluate Dr. Harris's August 28, 2015 opinion regarding Dollinger's functional limitations.  It is further recommended this matter be remanded to afford the ALJ the opportunity to sufficiently evaluate and explain the weight ascribed to the above limitations assessed by Dr. Harris.

**b.  Dr. Sipps's Opinions**

As mentioned above, the ALJ found Dollinger's ADHD a severe impairment at Step Two and considered the medical evidence regarding Dollinger's mental impairments at Step Four.  (Tr. 14, 17-27.)

---

[6] While the ALJ included the limited range of motion in his recitation of the evidence, reciting the evidence is not the same as analyzing it.  *See* n.5, *supra*.

Regarding Dollinger's mental impairments, the ALJ acknowledged records documenting deficits in working memory, auditory memory, and delayed memory.  (*Id.* at 19.)  However, the ALJ also noted that Dollinger continued to make good progress in his treatment with Dr. Sipps.  (*Id.* at 20-21.)  The ALJ repeatedly noted Dr. Sipps's records included no mental status examination and "little in the way of objective evidence."  (*Id.* at 19-20, 22.)

The ALJ then considered the medical opinion evidence.  (*Id.* at 23-27.)  Regarding Dollinger's mental impairments, the ALJ assigned "considerable weight" to the opinions of state agency sources, Drs. Swain and Haskins.  (*Id.* at 23-24.)  The ALJ also assigned "considerable weight" to the opinion of the consultative examiner, Dr. Konieczny, "to the extent it is consistent with the mental residual functional capacity above, as the mental health evidence of record generally supports it."  (*Id.* at 24.)  In weighing Dr. Konieczny's opinion, the ALJ noted "that Dr. Sipps' opinions discussed below differ from the remainder of the evidence."  (*Id.*)  The ALJ then analyzed Dr. Sipps's opinions as follows:

> The claimant's treating psychiatrist, Gary Sipps, Ph.D., provided numerous opinions regarding the claimant's mental health functioning (Exhibits 13F, 19F, 22F).  He prepared correspondence dated February 18, 2014, July 16, 2014, October 27, 2014, April 16, 2015, and July 29, 2015 indicating that the claimant was "currently limited in his capacity for remunerative employment" due to his impairment in his ability to understand, remember, and follow instructions, maintain attention and concentration with appropriate persistence and pace in the performance of multistep tasks and his ability to respond appropriately to work pressures in a work setting (Exhibit 13F/4-7).  He also prepared a Medical Source Statement in August 2015 indicating that, as of February 18, 2014, the claimant had predominantly occasional or rare mental abilities to make occupational adjustments, intellectual functioning and make personal and social adjustments (Exhibit 13F/2-3).  The undersigned accords limited weight to these opinions, as the mental health evidence does not fully support these limitations.  Dr. Sipps consistently noted that the claimant was making good progress (Exhibit 37F and 38F).  Additionally, upon examination, the claimant was found to have limited recall.  However, he was further found to be pleasant and cooperative, he maintained appropriate eye contact, he was oriented, his ability to concentrate and attend to tasks showed no indications of impairment, and he performed a serial seven subtraction task without error.  His insight showed no indication of impairment and he

50

showed no deficits in his overall level of judgment. Upon testing, his full scale IQ placed him in the average range of intellectual functioning (Exhibit 10F). Therefore, these findings are granted limited weight.

Dr. Sipps prepared another Medical Source Statement in August of 2015. Here, he found that as of August 10, 2015, the claimant had from occasional to constant abilities to make occupational adjustments, intellectual functioning, and make personal and social adjustments (Exhibit 13F/9-l0). The undersigned accords this opinion limited weight, though the undersigned notes that it reflects improvement in the claimant's cognitive capacity, which is also reflected in overall evidence. The claimant was consistently found to make good progress (Exhibit 37F and 38F).

Additionally, upon examination, the claimant's ability to concentrate and attend to tasks showed no indications of impairment. He performed a serial seven subtraction task without error. Upon testing, his full scale IQ placed him in the average range of intellectual functioning (Exhibit 1OF). Therefore, this opinion is granted limited weight.

Dr. Sipps opined on November 6, 2015 that, although the claimant has continued to make "good (psychological) progress," it has been hindered by ongoing health circumstances, and the claimant continues to be unable to engage in remunerative employment, as he is unable to "maintain necessary routines and regimen required in the workplace." He found that the claimant's estimated return to work date was February 28, 2016 (Exhibit 22F/2). On August 18, 2016, Dr. Sipps opined that the claimant "continues with good progress," but noted that his progress was limited to a degree by ongoing health circumstance. He opined that the claimant continued currently to be limited in his capacity for remunerative employment due to impairment in his ability to "maintain necessary routines and regimen required in the workplace." He estimated that the claimant's return to work date was November 18, 2016 (Exhibit 25F/3). On March 1, 2017, Dr. Sipps again wrote a letter finding that the claimant continued to progress, but noted that this was limited due to his ongoing health circumstances. Dr. Sipps opined that the claimant continued, "to be limited in his capacity for remunerative employment due to impairment in his ability to maintain necessary routines and regimen required in the workplace. Given his current status, and estimated return to work date is September 1, 2017" (Exhibit 30F/l). The undersigned grants these opinions limited weight. Dr. Sipps did not define the claimant's exact limitations or support his findings with objective evidence. Additionally, Dr. Sipps did not explain how he determined the claimant's return to work date, or why this date kept changing. Furthermore, these findings are inconsistent with the overall evidence, which shows the claimant has always made good progress with his psychiatric treatment in all evaluations (Exhibit 37F and 38F). Additionally, while the objective evidence does show some limitations due to the claimant's impairments, he was additionally found to be in the

average range of intellectual functioning. There was no indication of impairment of insight or judgment, he was able to perform serial sevens without error, and he was noted to be pleasant and cooperative. His ability to concentrate and attend to tasks showed no indications of impairment (Exhibit 10F). Therefore, these findings are granted limited weight.

On March 1, 2017, Dr. Sipps opined that the claimant had from no to moderate limitations in understanding, remembering, or applying information, from no to mild limitations interacting with others, from mild to marked limitations in concentrating, persisting, or maintaining pace, and from no to moderate limitations in adapting or managing oneself (Exhibit 26F/l-2). The undersigned grants this opinion some weight. The record does not support marked limitations in concentrating, persisting, or maintaining pace. In fact, upon examination, the claimant's ability to concentrate and attend to tasks showed no indications of impairment and he was able to do serial sevens without error (Exhibit 10F). Further, Dr. Sipps continued to note that the claimant was consistently making good progress (Exhibit 37F and 38F). Therefore, this opinion is granted some weight.

(*Id.* at 25-27.)

Dollinger asserts, "The ALJ's evaluation of this opinion evidence suffers the same shortcomings as Dr. Harris' since the ALJ skipped the necessary controlling weight analysis required of the treating physician rule and then dismissed each of Dr. Sipps' opinions in a perfunctory manner without any meaningful application of the factors set forth in the regulations." (Doc. No 12 at 28.)  Like his discussion of Dr. Harris's opinions, the ALJ's discussion of Dr. Sipps's opinions fails to either mention the "controlling weight" concept or properly assess the regulatory factors set forth in 20 C.F.R. § 404.1527(c)(2), *i.e.*, whether the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence in the case record."

Like Dr. Harris, Dr. Sipps completed three medical source statements that were check-box forms. (Tr. 917-18, 924-25, 1219-20.)  Unlike Dr. Harris, Dr. Sipps referenced attachments to his medical source statements as support for his findings.  (*Id.*)  Attached to his 2015 medical source statements were a series of letters stating Dollinger was "currently limited"  in his ability for gainful employment as a result of

52

impairments in his ability to understand, remember, and follow instructions, maintain attention and concentration with appropriate persistence and pace in performing multistep tasks, and respond appropriately to work pressures and estimated Dollinger's return to work dates as August 18, 2014, November 17, 2014, April 27, 2015, July 16, 2015, and October 29, 2015. (*Id.* at 919, 920-23, 1221.) Attached to his 2017 medical source statement was a single treatment record from August 20, 2013 that stated in its entirety:

> [R]eviewed report of KSU neuropsychological evaluation of 2010 indicating the presence of 314.01; discussed his dealing with his circumstances over the years; continued to address frustration; interventions addressing aspects of components of treatment plan; continued to review pain management strategies; affective-cognitive connections reviewed and strategies discussed; conducted induction to which he responded very well-focus writing activity; perceptions/experiences reviewed, he continue [sic] with writing, meditation.

(*Id.* at 1221.)

The Court notes that these attachments, as well as Dr. Sipps's many letters regarding Dollinger's estimated return to work, as the ALJ repeatedly stated was true of Dr. Sipps's treatment notes as a whole, contain "little in the way of objective evidence." The opinion of a treating source must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris*, 756 F.2d at 435; *Bogle*, 998 F.2d at 347-48; *Blakley*, 581 F.3d at 406. Nevertheless, as the undersigned recommends this matter be remanded for proper weighing and articulation of Dr. Harris's August 2015 opinion in formulating the RFC, the ALJ will have the opportunity to reconsider Dr. Sipps's opinions in his RFC analysis and determination.

**B.     Second Assignment of Error: RFC Determination and Weight Assigned to State Agency Reviewing Sources**

In his second assignment of error, Dollinger asserts the ALJ's RFC findings lack substantial evidence, as the ALJ "erroneously granted considerable weight to the opinions of non-examining State agency physicians and dismissed the opinions of treating physicians, and omitted or ignored treatment

records which contained reports and findings that supported a far more restrictive residual functional capacity." (Doc. No. 12 at 31.) Dollinger further argues the state agency reviewing physicians' opinions were rendered in December 2013 and April 2014, and after that time Dollinger was diagnosed with asthma, a right shoulder impairment, and a left knee impairment. (*Id.*) Dollinger also asserts the ALJ erred regarding his mental impairments in giving greater weight to the non-examining state agency sources than his treating psychologist's opinion. (*Id.* at 33.) In addition, Dollinger appears to argue the RFC lacks substantial evidence because it was not based on any medical opinions. (*Id.* at 32-33.) Finally, Dollinger argues the ALJ "did not fully account for limitations imposed by [his] cognitive and sleep impairments in the residual functional capacity finding." (*Id.* at 34.)

The Commissioner responds the ALJ "appropriately weighed" the state agency reviewing sources' opinions and properly considered evidence post-dating their record review. (Doc. No. 14 at 12.) In addition, the Commissioner asserts it is not by itself "reversible error" to assign more weight to the opinions of examining sources than treating sources. (*Id.* at 14.) In addition, the Commissioner argues the ALJ "reasonably determined" Dollinger's RFC, and it is for the ALJ, not a physician, to determine the RFC. (*Id.* at 14-15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

54

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis*); Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the

portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Dollinger's brief makes clear that much of his assignment of error regarding the weight assigned to the state agency reviewing sources' opinions is intertwined with his treating source argument. As discussed above, the undersigned recommends remanding this case because of reversible error committed with respect to Dr. Harris's August 2015 opinion. Proper consideration of the relevant medical opinion evidence may affect the ALJ's RFC findings. On remand, the ALJ will have an opportunity to revisit and reassess his RFC findings after reconsideration and proper weighing and articulation of the medical opinion evidence.

However, to the extent Dollinger argues the ALJ committed separate error because the RFC was not based on a medical opinion, that argument is not well taken. The Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for deciding an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir.) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by

substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED IN PART and REVERSED AND REMANDED IN PART for further proceedings consistent with this opinion.

Dated: October 19, 2020                               *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge


## OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**